# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

OMAR SOSA-GONZALEZ,

Defendant.

CRIMINAL NO. 25-124 (GMM)(HRV)

## REPORT AND RECOMMENDATION

Pending before the Court is defendant Omar Sosa-González' (hereinafter "Sosa-González" or "defendant") motion to suppress. (Docket No. 27). The United States filed a response in opposition. (Docket No. 32). The suppression matter has been referred to me by the presiding District Judge for report and recommendation. (Docket No. 28).

### I.  PROCEDURAL BACKGROUND

On March 12, 2025, a grand jury sitting in this district returned an indictment charging Sosa-González with being a prohibited person (convicted felon) in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Docket No. 11). These charges arose out of an intervention by an agent of the Carolina Municipal Police ("CMP") that took place on March 8, 2025. As per the criminal complaint authorized by the undersigned, on that date, a CMP officer was dispatched to the scene of a car accident on Roberto Clemente Avenue. Upon arrival, and as he was interviewing him in relation to the car accident, the CMP agent allegedly observed the barrel of a firearm, a Glock, model 23, .40 caliber pistol,

protruding from a fanny pack that Sosa-González had. (Docket No. 1). He placed the defendant under arrest and, subsequently, the case was authorized for federal prosecution. (Id.). The defendant pleaded not guilty to the sole count contained in the indictment. (Docket Nos. 14, 17). He has been ordered detained without bail pending trial. (Docket No. 16).

On July 1, 2025, Sosa-González moved to suppress the fruits of what he claims was an unconstitutional search of the fanny pack he had on March 8, 2025, and where the firearm and ammunition were found. (Docket No. 27). He argues that the CMP officer searched his bag in violation of his Fourth Amendment rights because the agent lied about observing the barrel of a pistol sticking out of the fanny pack. (Id.). Sosa-González says that since the agent was not truthful about the alleged observation, the plain view doctrine does not apply.

The United States opposes defendant's motion to suppress because no Fourth Amendment violation occurred in this case. (Docket No. 32). The Government contends that the plain view doctrine applies because the CMP officer, who was responding to a call to investigate a car accident, was lawfully present at the scene and was in a position to clearly see the tip of the gun. The incriminating nature the item seized was readily apparent according to the Government, because when asked if he had a firearms permit, defendant responded in the negative. The Government also claims that the statements made by the defendant under the penalty of perjury in support of his motion to suppress are self-serving.

I held an evidentiary hearing on August 14, 2025. (Docket No. 37). The government called CMP officer Frank Badillo Adorno ("agent Badillo") as its only witness.

I admitted into evidence Government Exhibits 1 through 6. (Id.). The defense presented the testimony of Sosa-González and introduced Exhibits A through D. (Id.). Following the presentation of evidence, then I heard closing arguments from the parties. (Id.).

## II.   FINDINGS OF FACT

With the benefit of the parties' written submissions, as well as the documentary and testimonial evidence received at the suppression hearing, I now make the following proposed findings of fact. Unless otherwise noted, these facts are largely undisputed.

Agent Badillo has been a CMP officer for over 31 years. Throughout his career he has served in different roles, including being part of the security detail for the mayor of Carolina from 2000 through 2017, and working in the Special Services for Highway Patrol division from 2017 to the present. Presently, his duties include conducting preventive patrols, investigating vehicular accidents, enforcing public ordinances, addressing public disturbances, and responding to fires, among others. Agent Badillo has testified many times in the local court, but this case was the first time he was called to testify in federal court.

In his current role, and since 2017, agent Badillo patrols Carolina's principal thoroughfares, including the Roberto Clemente, Fragoso, Fidalgo Diaz, Campo Rico, Monserrate, Sanchez Castaño and Isla Verde avenues. The agent explained that when a traffic accident occurs, the persons involved request the assistance of the police to file a complaint. After a car accident is reported, the standard procedure is that an agent will go to the scene of accident and investigate. Said investigation encompasses interviewing the parties involved, taking down their information, and providing a complaint number. On a given day, agent Badillo handles an average of one to three complaints regarding

traffic accidents. If the accident is not a major one, the process normally takes a few minutes.

On March 8, 2025, agent Badillo worked the 10am to 6pm shift. That day, he was assigned to patrol the Roberto Clemente Avenue. He does not recall whether he had additional avenues assigned on that day. At around 10:40-10:50 a.m., a call was received from the Command Center for him to report to a traffic accident at the intersection of Roberto Clemente Avenue and 66th street. No other information was provided to the agent at that time.

When he received the radio dispatch, agent Badillo had not yet boarded his assigned car. He was prepping to leave the station and about to hop into the patrol car. The station is about block away from the location of the accident. It took him approximately between four and five minutes to get to the site of the accident from the time he received the call. Agent Badillo went there by himself. He testified that it was not unusual to go on patrol alone; it depended on the available personnel.

When he arrived, agent Badillo saw two vehicles. He marked the location of the accident in Government's Ex. 1-A. The vehicle of Mr. Ryan Cruz was parked in the corner, near a doctor's office. The vehicle of Mr. Sosa was at the entrance of Street 66. Agent Badillo marked the position of the vehicles in Government's Ex. 1-B. Both drivers were already outside their vehicles when he arrived. Agent Badillo indicated where their position was within the map in Government's Ex. 1-C. Agent Badillo also recognized the photograph of the intersection where the accident occurred in Government's Ex. 2. The agent had not had any prior interactions with any of the drivers.

Upon arrival, the agent proceeded to interview both drivers and asked them for their license and registration. Usually, after he interviews both parties, he determines who is the party responsible for the accident. He first interviewed Mr. Ryan Cruz who related that he came from south to the north on Roberto Clemente Avenue and stopped to make a left turn towards Fernandez Bakery. Cruz said that he had his turn signal on when he was impacted from behind. Government's Ex.-D shows an arrow where Mr. Cruz was stopped waiting to turn when Mr. Sosa-González rear-ended his car.

After concluding the interview with Cruz, agent Badillo went to interview Sosa-González. Defendant told him that he was there waiting for the police to do the accident report. During the interview, Sosa-González was three to four feet away from agent Badillo.

Turning to the main factually disputed issue, agent Badillo testified that Sosa-González was carrying a black fanny pack, and he saw the barrel of a gun sticking out about a half inch from the bag. The zipper in front of the bag was approximately one-inch open. Agent Badillo does not know whether the bag's back zipper was open at that time. According to Agent Badillo, one of the zippers of the fanny pack was stuck, as it is a little rusty. He remembers that it was like that at the time of the events.

Agent Badillo stated under oath that Sosa-González was standing up and carrying the fanny pack over his left shoulder. He did not see Sosa-González reaching for the bag at any time or touching its contents including the firearm. It was his impression that Sosa-González was not trying to hide the fanny pack.

According to agent Badillo, having been a police officer for more than 30 years with a government-issued firearm, he knows how to recognize one. At that point, Agent

5

Badillo stopped the interview and asked Sosa-González whether he had a weapons permit. Although in his patrol and traffic interventions agent Badillo usually does not ask about firearms, when he noticed the barrel, he had to ask because that is standard procedure. Sosa-González replied that he did not have a license.

Agent Badillo relayed that it is the first time that he has been involved in a situation like that. Agent Badillo grabbed the bag, placed Sosa-González under arrest and read him his Miranda Rights. Inside the bag, among other items, he found a Glock pistol with a magazine attached to it, and an additional magazine loaded with ammunition. There was also a pack of cigarettes, a lighter, and other items. Agent Badillo called the arrest in, and additional patrol units arrived to assist. The Puerto Rico Police Technical Services division was also called. Pictures of the scene were taken as evidence. The entire intervention lasted between one and a half to two hours.

At some point, agent Badillo learned that Mr. Sosa-González was on "federal probation."[1] He then contacted the United States Probation Office and was referred to ATF Special Agent Favio Rodríguez, who took over the case. Sosa-González was transported to the Carolina Municipal Police Station.

Finally, in response to a question posed by the Government, agent Badillo stated that he receives no benefit for finding a firearm during a traffic intervention.

On cross examination, agent Badillo was asked about an incident report he drafted on March 26, 2025, which was submitted as Defense Exhibit A. He never supplemented

---

[1] Federal probation is often confused with supervised release. I take judicial notice of the fact that Mr. Sosa-Gonzáles was serving a term of supervised release. *See* Criminal No. 17-247 (GMM).

6

the report. In it, Agent Badillo did not indicate that the gun was visible prior to the seizure of the fanny pack and the arrest. He stated during re-direct that the report only requires a brief narrative, and does not need to contain all the details of the intervention.[2]

After the Government rested, the defense presented the testimony of Sosa-González. He testified that on March 8, 2025, he was at his aunt's house in the Cacao Ward cleaning her backyard. He talked to his mother, and she asked him to get some cash from the ATM machine. He then went to the Plaza Carolina Shopping Mall and withdrew the money. He called his mother again to ask about lunch and headed to a food establishment to buy her chicken and fries. During all these errands, Sosa-González was alone and driving his mother's Mitsubishi Outlander.

As defendant was driving through Roberto Clemente Avenue, on his way to buy lunch and about two to three minutes away from his destination, the car in front of him suddenly stopped. Sosa-González impacted the car from behind. Although he testified that the car he hit was a black Kia, the parties stipulated that it was in fact a Ford Mustang.

Sosa-González testified that he got out of the car and told the other driver to pull over to the side of the road to avoid disrupting traffic. Defendant's Exhibit B shows where the accident happened. Defendant then relayed that before getting out of the vehicle after pulling over, he took his firearm, cigarettes, wallet, and ammunition, put it all inside the fanny pack, and closed it completely. He put the firearm within the meshed pocket inside

---

[2] Exhibit A, the incident report, is in Spanish. The defense requested 10 days to submit a certified English translation of the exhibit. The 10 working days requested expired yesterday, and the certified translation was not submitted. Therefore, I cannot consider Exhibit A. I note that even if the incident report had been considered as part of the evidence, it would not have altered my credibility findings.

the fanny pack and closed the zipper. The defendant marked the spot where he allegedly stored the gun in Exhibit D. Sosa-Gonzáles also said that on March 8, 2025, both zippers in the front pocket of the bag were working fine. According to his testimony, Sosa-González did all of this because knowing that he did not have a driver's license, he feared that the police would search the vehicle and find the firearm. He further stated that he placed his belongings into the fanny pack because this is not his first firearms case.

Sosa-González also testified that he talked to Mr. Cruz and asked him not to call the police until his mother arrived at the scene because he did not have a driver's license. He proposed to the other driver to make the traffic complaint in her name even though she was not the one driving the vehicle. Mr. Cruz did not agree to this and called the police. Sosa-González sat down on the sidewalk smoking a cigarette waiting for the police to arrive.

The police took between 15 to 20 minutes to arrive according to defendant's testimony. The agent interviewed Mr. Cruz first. After that interview, agent Badillo went up to him and directly asked him if he had a gun. Sosa-González responded "no."

He further testified that he is right-handed and was carrying the fanny pack across his torso, with the fanny back to his back. At no time did he touch the bag, much less opened it. Agent Badillo asked him a second time whether he had a weapon in the fanny pack and defendant again responded that he did not. The agent then got even closer to him and yanked away the fanny pack. Upon opening it, the agent saw the weapon and the other contents of the fanny pack.

On cross examination, Sosa-González was confronted with the unsworn statement under the penalty of perjury that he submitted in support of his motion to

suppress, Docket No. 27-1. He admitted that he did not mention in said statement that he had placed the gun in the inside mesh pocket of the fanny pack. He also acknowledged that he is aware that he is facing a statutory maximum imprisonment term of 15 years and that he does not want to spend more time in prison.

It should be noted that both parties conducted demonstrations trying to place some of the items inside the fanny pack. While these demonstrations were helpful, none reflected the reality of the events of March 8, 2025. On that date, the firearm was not cocked (see Government's Exhibit 3) and it had a magazine attached to it. Also, there was an extra loaded magazine and other items. In the courtroom, the fanny pack and the firearm had evidence tags attached to them (Exhibits 3 and 4), and the ammunition was inside an evidence bag and in loose format. (Exhibit 6). For safety reasons, the conditions that existed on March 8, 2025, such as loading the magazines with ammunition and attaching one to the gun, could not be recreated. Though not determinative[3], the demonstrations provided sufficient context to assist me in analyzing the issues.

### III.  APPLICABLE LAW AND DISCUSSION

**A.  Standard of Review**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. A criminal defendant seeking to suppress evidence bears a

---

[3] The demonstrations were not determinative to the ultimate issue in this case because on the one hand, when agent Badillo demonstrated how defendant held the fanny pack on his left shoulder and with the zipper open about one inch, I was able to see the tip of the pistol that had been placed inside. On the other hand, I myself handled the fanny pack and the demonstration of the defense showed that the bag was big enough for all items to fit inside with the zipper closed all the way. Thus, both versions of events are possible.

threshold burden of showing that a Fourth Amendment violation occurred, which in turn encompasses the burden of establishing that he or she was subjected to a warrantless search or seizure. *See United States v. Young*, 835 F.3d 13, 19 (1st Cir. 2016); *see also United States v. Fields*, 823 F.3d 20, 25 (1st Cir. 2016). Once the defendant establishes that a warrantless search or seizure occurred, the burden then shifts to the government to prove by a preponderance of the evidence that said search or seizure was lawful. *United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974); *United States v. Delgado-Perez*, 867 F.3d 244, 250 (1st Cir. 2017).

**B.     The Plain View Doctrine**

It is axiomatic that warrantless searches and seizures are *per se* unreasonable unless they fall within one of the "few specifically established and well-delineated exceptions" to the Fourth Amendment warrant requirement. *Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). The plain view doctrine is one of the recognized exceptions. *See Coolidge v. New Hampshire*, 403 U.S. 443, 468, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

As originally conceived by the Supreme Court, in addition to requiring that an officer lawfully and properly be in a position where he or she can view a particular area and that it be "immediately apparent" that the items observed are evidence of a crime, contraband or otherwise subject to seizure, the plain view doctrine required that incriminating evidence be discovered "inadvertently." *Texas v. Brown*, 460 U.S. 730, 737, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983) (discussing the elements of the plain view doctrine as set forth in *Coolidge*). The Supreme Court subsequently clarified that "even though inadvertence is a characteristic of most legitimate 'plain view' seizures, it is not a

necessary condition." *Horton v. California*, 496 U.S. 128, 130, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). Thus, inadvertence no longer being a requirement, the plain view doctrine simply "permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015).

"The first element of the test is straightforward and easy to apply." *United States v. Badillo-Hernandez*, No. 24-cr-148 (ADC), 2025 WL 1906755, 2025 U.S. Dist. LEXIS 132593, at * 14 (July 10, 2015) (Lopez-Soler, M.J.). The initial warrantless intrusion must be lawful under the Fourth Amendment so that an officer can be said to have lawfully arrived at the place from which he or she plainly could view the seized object. *United States v. Jones*, 187 F.3d 210, 219 (1st Cir. 1999) (citations omitted). The object, in turn, must be "easily visible to the naked eye." *United States v. Sanchez*, 612 F.3d 1, 5 (1st Cir. 2010).

The second element is satisfied when the incriminating character of the evidence is immediately apparent to the officer, that is, there is probable cause to believe it is evidence of criminal activity. *United States v. Hammie*, 165 F.3d 80, 83 (1st Cir. 1999). Contrarywise, the incriminating character of the item is not immediately apparent "if the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). But the First Circuit has cautioned that "[t]he officer need not be certain of the incriminating character of an object, but, rather,

11

must have a belief based on a 'practical nontechnical probability' that the object is evidence of a crime." *United States v. Paneto*, 661 F.3d 709, 714 (1st Cir. 2011).

As to the third element—lawful right to access the item itself—the court must ask not whether the officer was lawfully in a position to see the contraband, which is the first element of the test; rather, whether the officer "could lawfully seize it without committing a trespass." *United States v. Allen*, 573 F.3d 42, 51 n.4 (1st Cir. 2009); *see also United States v. Keleher*, 516 F. Supp. 3d 162, 168 (D.P.R. 2021) (seizure of emails did not constitute a trespass because they were already in the government's possession.).

**C.   Discussion**

The parties agree that the outcome of the suppression issue boils down to a credibility determination. If I believe agent Badillo's testimony that he saw the barrel of a gun sticking out of defendant's fanny pack, the plain view doctrine comes into play and no Fourth Amendment violation occurred. If, on the other hand, I find that the agent was not truthful with respect to the critical observation, then suppression is warranted. Sosa-González contends that the testimony of agent Badillo should not be credited because "it defies logic" and that I should believe his testimony instead, that the gun was not visible. According to the defendant, by forcibly grabbing the fanny pack and opening it, the agent effectuated an unreasonable warrantless search.

In this case, I am faced with two versions of the events neither of which can be discarded outright as inherently incredible. Both witnesses have told coherent stories that are not contradicted by extrinsic evidence nor are their testimonies internally inconsistent. After carefully evaluating these testimonies under the totality of the circumstances and in light of the other evidence presented at the hearing; and upon

12

considering the demeanor and inflections of both witnesses while testifying, including their responsiveness to the questions, as well as any potential motivation to lie, I find that agent Badillo testified credibly. His testimony, therefore, that he saw the tip of the gun protruding from the fanny pack should be fully credited.

At no time, not even during cross-examination, did the agent exhibit evasiveness or any other characteristic that would lead me to conclude that his testimony as to the central issue in this case was a fabrication. For example, when confronted with certain omissions in the incident report he prepared, the agent readily admitted that some details were not included. The agent candidly acknowledged on a few occasions that he did not recall a specific detail he was being asked about, something that in my view bolsters his credibility. His tone and demeanor remained steadfast, unwavering and without hesitation throughout his testimony.

As noted, Sosa-González likewise provided a version of the events that is plausible and which, if believed, would make it impossible for agent Badillo to have seen the barrel of the gun. But several factors move me to credit agent Badillo's version over Sosa-Gonzalez's. First, agent Badillo is a patrol officer that was called to investigate a car accident. Second, he did not know and had no prior interactions with the defendant (or the other driver for that matter). Third, the unrebutted testimony was that in his over 30 years as a CMP officer, this case was the first time that he encountered a situation where a routine car accident dispatch turned into an arrest for illegal possession of a firearm. In that sense, there was nothing presented at the hearing that would raise the inference or lead me to suspect that agent Badillo was looking to score an illegal firearms's arrest.

Lastly, beyond the general claim by the defense that his version "defies logic", agent Badillo's testimony proceeded to conclusion completely unimpeached.

For me to find that the agents' testimony regarding the crucial observation was false, as the defense is urging me to do, I would also have to conclude that agent Badillo committed a most serious crime of perjury in the courtroom before me, a finding I am not prepared to make based on the totality of the evidence I heard.[4]

Sosa-González, on the other hand, has prior convictions (Docket No. 13-1); was on supervised release at the time of the incident; and candidly admitted (to his credit), that he does not wish to spend more time in prison. It weighs heavily in my decision to assign less credibility to his testimony that he proposed to the other driver to not call the police until his mother arrived at the scene and to have the complaint falsely reflect that it was his mother who was driving. The dishonesty involved in the suggested course of action, which is tantamount to fraud, cuts against the defendant in the credibility assessment. It invites the inference that Sosa-González is willing to go to great lengths to avoid facing the consequences of his actions.

Again, after considering the totality of the circumstances, I find that agent Badillo's testimony is deserving of credibility. Thus, I decline to assign credibility to the version of Sosa-González, for the reasons outlined above. *See Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) (explaining that when "a trial

---

[4] That is not to say that I am prepared to find that Sosa-González perjured himself either just because I gave credibility to the version of the agent. I am simply underscoring the nuances involved in assigning credibility to one witness and not the other in relation to the central issue in the case.

judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."); *see also United States v. Henderson*, 463 F.3d 27, 32 (1st Cir. 2006) (*quoting United States v. Weidul*, 325 F.3d 50, 53 (1st Cir. 2003) (recognizing that "a district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous.").

Having determined that the version of agent Badillo is credible, I have no difficulty finding that the Government has met its burden to show by a preponderance of the evidence that the search and seizure at issue was lawful under the plain view doctrine. First, there is no dispute that the agent was called to investigate a car accident in a public road. The standard operating procedure required an interview of the persons involved in the accident. Agent Badillo was, therefore, lawfully at the place where he could make the observation at issue. In other words, he was looking from a lawful vantage point. What's more, Sosa-González put in motion the chain of events that permitted agent Badillo to view the item because he displayed the fanny pack openly by carrying it on his person to be easily visible by the naked eye.[5]

As to the second element, it is also clear that the incriminating nature of the item (gun) was immediately apparent. The observation of what in his training and experience

---

[5] On this score, my finding is buttressed by defendant's explanation of the reasons that prompted him to carry the fanny pack on him instead of keeping it in the car. According to his testimony, he figured that because he did not have a driver's license, the car could be searched by the police.

he identified as a firearm coupled with the defendant's statement that he did not have a firearm's license, gave rise to probable cause that Sosa-González was unlawfully carrying and possessing the weapon.[6] *See Texas v. Brown*, 460 U.S. at 742-43 (officer's training and experience relevant to determine whether the incriminating nature of the evidence is apparent); *see also United States v. Rivera-Melecio*, No. 16-cr-198 (GAG), 2018 WL 6567955, 2018 U.S. Dist. LEXIS 203566 at *27 (D.P.R. June 13, 2018), *report and recommendation adopted by* 2018 U.S. Dist. LEXIS 203423 (D.P.R., Nov. 30, 2018) (finding that the seizure of the firearm satisfied the probable cause standard as the incriminating nature of the firearm was apparent as it was indicative to the police officer that there was a violation to the PR Weapons Law for possession of a firearm without a permit.); *United States v. Nunez-Torres*, 601 F. Supp. 2d 388, 391 (D.P.R. 2008) (denying motion to suppress and upholding magistrate judge's finding regarding the warrantless seizure of firearm observed in plain view where defendant indicated he did not have a firearms license.).

Lastly, agent Badillo had a lawful right to access the fanny pack at issue here. According to the evidence presented at the suppression hearing, he was on a public road and in a position—facing Sosa-González at a close distance—where he could take possession of the firearm by just grabbing the fanny pack as he did. As noted above, such seizure was justified by probable cause. And the officer did not have to commit a trespass

---

[6] Under Puerto Rico law, it is unlawful to possess and carry a firearm without a license. *See* P.R. Laws Ann., tit. 25, §§ 466d, 466g.

16

in order to gain access to the gun. *See United States v. Sanchez,* 612 F.3d at 7 (officers were lawfully in a parking lot and could access motorcycle without trespassing.).

### IV. CONCLUSION

In view of the foregoing, I recommend that Sosa-González' motions to suppress (Docket No. 27) be DENIED.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone,* 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**

In San Juan, Puerto Rico this 29th day of August, 2025.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE